**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                                    :
GARDEN STATE EQUITIES, INC., et al.,   :
                                                    :
              Plaintiffs,                   :
                                                    :          Civil Action No. 05-0085 (JAG)
                    v.                        :
                                                    :               **OPINION**
DEANE EARL ROSS, et al.,              :
                                                    :
              Defendants.                 :
_____:


**GREENAWAY, JR., U.S.D.J.**

This matter comes before this Court on the motion of defendants Deane Earl Ross
("Ross"), Stonepine, Inc. ("Stonepine"), Wilshire Investments Corporation ("Wilshire"), F.D.
Worth, L.P. ("F.D. Worth"), Associated Financial Corporation ("AFC"), and Yorkshire
Investments, LLC ("Yorkshire") (collectively, "Defendants"), to dismiss the Amended
Complaint, pursuant to FED. R. CIV. P. 12(b)(2), for lack of personal jurisdiction as to defendants
AFC, Ross, and Wilshire, and, as to all Defendants, pursuant to FED. R. CIV. P. 12(b)(6), for
failure to state a claim upon which relief can be granted.  Also, all of the Defendants have moved
to strike specific allegations of the Amended Complaint, pursuant to FED. R. CIV. P. 12(f).  For
the reasons set forth below, Defendants' motion to dismiss will be granted in part, and denied in
part.  Defendants' motion to strike will be denied.

## BACKGROUND

Plaintiffs and Defendants are individuals and corporate entities engaged in the real estate industry.  All Plaintiffs maintain their principal offices in East Orange, New Jersey.  (Amended Complaint ("AC"), at ¶ 3.)  Plaintiff Garden State Equities, Inc. ("Garden State") is a New Jersey Corporation.  (Id. ¶ 4.)  Plaintiff Colonnades Tower Associates, LP ("Colonnades Tower") is a New Jersey limited partnership.  (Id. ¶ 5.)  Plaintiff Oakwood Realty Co., LLC ("Oakwood Realty") is a New Jersey limited liability company.  (Id. ¶ 6.)  Plaintiff Glass Tower Associates, LP ("Glass Tower") is a New Jersey limited liability company which is a "co-managing general partner" of Colonnades Apartments, Ltd.[1]  (Id. ¶ 7.)  Plaintiff Ahron Kirzner ("Kirzner") is a resident of Brooklyn, New York, and is the general partner, president, and/or managing member of each of the other Plaintiffs, and owns and/or controls each of the other Plaintiffs.  (Id. ¶ 8.)

Defendants all maintain their principal offices in Los Angeles, California.  (Id. ¶ 10.) Defendant Ross is a resident of California.  (Id. ¶ 11.)  Defendant Stonepine is a Delaware Corporation which owns the "wrap" interest[2] in the Colonnades Apartments.  (Id. ¶ 19.) Stonepine is nominally owned by Bruce Rozet's ("Rozet")[3] widow and Ross' wife, but is controlled by Ross and serves as a vehicle through which Ross controls, and obtains proceeds from property located in New Jersey.  (Id.)  Defendant Wilshire is a California corporation and

---

[1]Colonnades Apartments, Ltd. owns the Colonnades Apartments, a 560 unit apartment building in Newark, New Jersey (one of the New Jersey properties relevant to this suit).  (AC ¶¶ 7, 26.)

[2]The wrap interest is a right to certain payments from Colonnades Apartment, Ltd., the entity in possession of the building.  (AC ¶ 19.)

[3]Rozet was Ross' longtime business partner.  (AC ¶ 13.)  Rozet died on October 30, 2003. (Id.)

the other "co-managing general partner" of Colonnades Apartments, Ltd.[4]  (Id. ¶ 20.)  Defendant

F.D. Worth is a California limited partnership.  (Id. ¶ 21.)  Defendant AFC is a California

corporation through which Ross manages, oversees, controls and/or conducts the business of the

other Defendants.[5]  (Id. ¶ 22.)  Defendant Yorkshire is a Delaware limited liability company

through which Ross owns and/or controls interests in F.D. Worth and the F.D. Worth Properties.

(Id. ¶ 23.)

     The instant dispute arises from Defendants' alleged breach of an oral agreement (the

"November 2003 Agreement") between the parties concerning options to purchase the wrap

interests in the Colonnades Apartments and in the four F.D. Worth Properties.  According to

Plaintiffs, the November 2003 Agreement evolved from a meeting between Kirzner, Ross, and

Rozet in January 2003, in Los Angeles, California, regarding issues with a prior oral agreement

(the "October 1999 Agreement").[6]  (Id. ¶¶ 54-56.)  After the parties met in January 2003, they

_____

[4]Wilshire serves as a vehicle through which Ross participates in overseeing and directing the operation of the Colonnades Apartments and the "F.D. Worth Properties" (a term coined by Plaintiffs to describe four apartment buildings in New Jersey (Reynolds Terrace, Pavilion, Hallmark House, and Frederick Douglas), the wrap interests of which are held by F.D. Worth. (AC ¶¶ 20, 27-31.)

[5]Many of the Defendants' actions and communications in connection with the instant dispute were taken in the name of, or on the letterhead of, or through agents of AFC.  (AC ¶ 22.)

[6]The parties relationship began in or about 1991, when Glass Tower acquired from Defendants part of the general partnership interest in the Colonnades Apartments, Ltd., and began managing the Colonnades Apartments.  (AC ¶ 33.)  In 1995, Garden State became the manager of the Colonnades Apartments.  (Id. ¶ 34.)  In or about January 1998, Colonnades Apartments Ltd., Canterbury Corporation, Stonepine, Wilshire, Colonnades Tower, Oakwood, and Glass Tower, entered into a series of agreements designed to govern the relationships of the various parties with interests in the operation of the Colonnades Apartments.  (Id. ¶ 35.)  The agreements included a general Agreement, a Management Agreement, a Security Agreement, and a Right of First Refusal Agreement (collectively, the "1998 Agreements").  (Id.)  Pursuant to the 1998 Agreements, Oakwood was designated as operator, and Oakwood in turn, designated

engaged in a series of telephone conversations and exchanges of correspondence regarding the

possibility of Plaintiffs buying out Defendants.  (Id. ¶ 56.)  On July 10, 2003, Rozet provided

Kirzner with a memorandum summarizing the status of the parties' discussion to that point, and

outlining a series of options to purchase interests in the wraps.  (Id. ¶ 57.)  Thereafter the parties

engaged in a further series of communications and meetings about the properties, including

telephone calls, faxes and/or e-mails sent to New Jersey by Ross, Rozet, the other Defendants

and their agents.  (Id. ¶ 58.)

From November 17, 2003 through November 19, 2003, Kirzner and his controller, Osh

Khublall ("Khublall"), met with Ross and his colleague and agent, Richard Tell ("Mr. Tell"), in

Los Angeles, California.  (Id. ¶ 59.)  Prior to this meeting the parties had obtained a commitment

---

Garden State as manager of the Colonnades Apartments.  (Id. ¶ 38.)  The 1998 Agreements were
negotiated in New Jersey through representatives of Defendants Ross, AFC, Stonepine, and
Wilshire, and Plaintiffs' representatives.  (Id. ¶ 40.)  Based on Defendants' satisfaction with
Plaintiffs' management of the Colonnades Apartments, when Defendants were presented with an
opportunity to oversee the management of the F.D. Worth Properties, they negotiated with
InterCoastal (the owner of the general partnership interest in the various entities owning the F.D.
Worth Properties) to consider having Plaintiffs manage the properties.  (Id. ¶¶ 43-45.)  Ross
personally visited New Jersey and Kirzner in connection with the transfer of management of the
F.D. Worth Properties.  (Id. ¶ 47.)  In or about late September and/or early October 1999,
Defendants and Plaintiffs entered into an agreement (the "October 1999 Agreement") pursuant to
which Defendants (in particular, Ross and Rozet) represented and promised that if Plaintiffs
would take over the management of the F.D. Worth Properties and manage those properties
profitably, Plaintiffs would receive twenty percent of the equity in the wrap interests of those
properties.  (Id. ¶ 48.)  In reliance on Ross and Rozet's representations, and pursuant to the
October 1999 Agreement, Plaintiffs thereafter entered into management agreements with the
entities owning each of the F.D. Worth Properties.  (Id. ¶ 49.)  Plaintiffs successfully managed
the properties, however, Defendants continually delayed and never delivered the writing they
promised confirming the twenty percent equity interest.  (Id. ¶ 52.)  Instead, Defendants stripped
the properties of much of their equity through multiple refinancings and/or loan transactions.
(Id.)  At the January 2003 meeting, Kirzner complained that Defendants were not honoring the
October 1999 Agreement, were stripping the F.D. Worth Properties of their equity, and were
depriving Plaintiffs of the value of the promised twenty percent interest in the wraps.  (Id. ¶ 55.)

4

for a loan to be secured by the Colonnades property.  (Id. ¶ 60.)  Both sides were unwilling to

proceed with the loan transaction absent an agreement on their relationship going forward.  (Id.)

Ross threatened that Kirzner could either take a buy-out at $4,000,000.00, or pay $750,000.00

and accept an option on the Colonnades Apartments wrap only.  (Id.)  Kirzner advised Ross that

he would not proceed unless he received either a larger buy-out sum to be negotiated or options

on all of the wraps.  (Id.)  Ross advised Plaintiffs that Defendants controlled only seventy percent

of the F.D. Worth wrap interests.  (Id. ¶ 61.)  He said that he would deliver the option as to the

Colonnades Apartments, and committed to obtain the remainder of the F.D. Worth wrap

interests, but he did not have them at that point.  (Id.)  Ross said he needed time, but was

absolutely certain he would be able to obtain the remaining thirty percent of the wrap interests.

(Id.)  The parties therefore agreed that Defendants would have a year to obtain the remaining

portion of the F.D. Worth wrap interests.  (Id.)

On November 19, 2003, the parties shook hands on terms which had evolved from

Rozet's July 10th Memorandum, Kirzner's counsel's letter of October 30, 2003 to Max Perry,

Esq. (Defendants' counsel), and other communications, but were based specifically on the

matters discussed at the Los Angeles, California meeting.[7]  (Id. ¶ 62.)  Later that day, Kirzner

returned to New Jersey to close the Colonnades loan.  (Id. ¶ 64.)  The next day, November 20,

2003, immediately prior to the closing, Ross approved, executed, and faxed a Closing Statement

expressly referencing the November 19, 2003 terms (the "November 2003 Agreement") to

Kirzner in New Jersey.  (Id. ¶ 65.)  Based on the parties' agreement, Plaintiffs proceeded with the

_____

[7]The financial terms were recorded at the meeting in certain handwritten notes, prepared
on November 18 and 19, some written by Khublall, and some by Ross.  (AC ¶ 62.)

Colonnades closing, and the closing proceeds were disbursed and/or escrowed in accordance with the agreed upon terms.  (Id. ¶¶ 66-67.)

Thereafter, questions arose regarding the accounting treatment of Defendants' portion of the Colonnades loan proceeds ($6,000,000.00).  (Id. ¶ 68.)  In addition, there were some issues (relating to default terms, security, and taxes) in drafting the option documentation.  (Id. ¶ 69.)  Plaintiffs later learned that Ross was not acting in good faith because Defendants had been obtaining appraisals of some of the properties, talking to buyers and prospective brokers, managers, and purchasers (all acts inconsistent with the November 2003 Agreement).  (Id. ¶¶ 70, 72.)  They also learned that Ross had no intention of honoring the November 2003 Agreement at the time it was made, and that Defendants had not made a good faith effort to obtain the remaining thirty percent interest in the F.D. Worth wraps.  (Id.)  On November 10, 2004, Kirzner, Khublall, and their counsel visited Los Angeles, California to meet with Ross, Mr. Tell, and their counsel, to finalize and execute the option agreements.  (Id. ¶ 73.)  No resolution was achieved.  (Id.)

Defendants have declared that they have no enforceable agreement with Plaintiffs other than the 1998 Agreements relating to the Colonnades Apartments.  (Id. ¶ 74.)  On December 29, 2004, InterCoastal issued notices terminating Garden State as manager of the F.D. Worth Properties.  (Id. ¶ 76.)  Plaintiffs believe that Ross caused InterCoastal to terminate Plaintiffs' management of the F.D. Worth Properties.  (Id. ¶ 77.)

The Amended Complaint sets forth claims for relief based upon: (1) fraud; (2) breach of contract; (3) breach of the duty of good faith and fair dealing; (4) promissory estoppel; (5) implied contract; and (6) tortious interference.  (Id. ¶¶ 78-98.)

6

## STANDARD OF REVIEW

### I.      Personal Jurisdiction

A federal court sitting in diversity must conduct a two-step analysis to ascertain whether personal jurisdiction exists.  First, the court must look to the forum state's long-arm statute to determine if personal jurisdiction is permitted over the defendant.  Second, the court must determine whether the exercise of jurisdiction violates Due Process of the Fourteenth Amendment.  See IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998); Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Products Co., 75 F.3d 147, 150 (3d Cir. 1996).

In this forum, the inquiry is collapsed into a single step, because New Jersey's long arm statute permits the exercise of personal jurisdiction to the fullest limits of due process, as defined under the Constitution of the United States.  As such, federal law defines the parameters of this Court's in personam jurisdiction.  See IMO Indus., Inc., 155 F.3d at 259.  The Fourteenth Amendment permits a state to exercise jurisdiction over an out-of-state defendant only where "the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).  It is the burden of the plaintiff to prove that the defendant has purposefully availed himself of the forum state.  See Burke v. Ouartev, 969 F. Supp. 921, 924 (D.N.J. 1997).

To prove that the defendant has purposefully availed itself of that state, a plaintiff may rely upon a defendant's specific contacts with the forum state.  The burden to produce actual evidence of the defendant's contacts with the forum state rests on the plaintiffs.  See Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66, 66 n.9 (3d Cir. 1984).  Personal

7

jurisdiction pursuant to such contacts is known as specific jurisdiction.  Specific jurisdiction is

invoked when a claim is related to or arises out of the defendant's contacts with the forum.  See

Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984); Dollar Sav. Bank

v. First Sec. Bank of Utah, 746 F.2d 208, 211 (3d Cir. 1984).  A court must first determine

whether the defendant had the minimum contacts with the forum necessary for the defendant to

have "reasonably anticipate[d] being haled into court there."  World-Wide Volkswagen Corp. v.

Woodson, 444 U.S. 286, 297 (1980) (citation omitted).  What constitutes minimum contacts

varies "with the quality and nature of the defendant's activity."  Hanson, 357 U.S. at 253.  In

assessing the sufficiency of minimum contacts for personal jurisdiction, the court must focus "on

the relations among the defendant, the forum, and the litigation."  Keeton v. Hustler, 465 U.S.

770, 780 (1984).  Otherwise stated, there must be at least "a single deliberate contact" with the

forum state that relates to the cause of action.  United States Golf Ass'n v. United States Amateur

Golf Ass'n, 690 F. Supp. 317, 320 (D.N.J. 1988).  The unilateral acts of the plaintiff, however,

will not amount to minimum contacts.  Helicopteros Nacionales de Colombia, 466 U.S. at 417;

Hansen, 257 U.S. at 253.

Assuming minimum contacts have been established, a court may inquire whether "the

assertion of personal jurisdiction would comport with 'fair play and substantial justice.'"  Burger

King Corporation v. Rudzewicz, 471 U.S. 462, 476 (1985) (quoting Int'l Shoe Co. v.

Washington, 326 U.S. 310, 320 (1945)).  See also Pennzoil Prod. Co. v. Colelli & Assoc., Inc.,

149 F.3d 197, 201 (3d Cir. 1998).  For personal jurisdiction to comport with "fair play and

substantial justice," it must be reasonable to require the defendant to defend the suit in the forum

state.  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980).  To determine

reasonableness, a court considers the following factors: the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiffs interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering substantive social policies.  Id.  Only in "rare cases [do the] 'minimum requirements inherent in the concept of "fair play and substantial justice" . . . defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities.'"  Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County, 480 U.S. 102, 116 (1987).

If the plaintiff cannot establish specific jurisdiction, a court may exercise general jurisdiction over the defendant if the defendant has maintained "continuous and systematic" contacts with the forum state.  Helicopteros Nacionales de Colombia, 466 U.S. at 416.  To establish general jurisdiction the plaintiff "must show significantly more than mere minimum contacts" with the forum state.  Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987).  Moreover, the facts required to establish general jurisdiction must be "extensive and persuasive."  Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas, 675 F.2d 587, 589 (3d Cir. 1982).

A particular defendant may be dismissed from a lawsuit if the court cannot assert personal jurisdiction over the defendant, pursuant to this standard.  See Fed. R. Civ. P. 12(b)(2).

## II.     Federal Rule of Civil Procedure 12(b)(6)

On a motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the

light most favorable to the non-moving party.  See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 (3d Cir. 1994).  A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim.  See In re Warfarin Sodium, 214 F.3d 395, 397-98 (3d Cir. 2000).  The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will prevail ultimately.  See Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000).  As established by this Circuit, "[t]he pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'"  Kost v. Kozakewicz, 1 F.3d 176, 183 (3d Cir. 1993) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357).

While a Court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations.  See Morse v. Lower Merion School District, 132 F.3d 902, 906 (3d Cir. 1997).  Upon Rule 12(b)(6) motions, federal courts may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record.  See Pittsburgh v. W. Penn Power Co., 147 F.3d 256, 259 (3d Cir. 1998).  Finally, Rule 12(b)(6) authorizes federal courts to dismiss a claim based on a "dispositive issue of law."  Mruz v. Caring, Inc., 991 F. Supp. 701, 707 (D.N.J. 1998) (citing Nietzke v. Williams, 490 U.S. 319, 326-27 (1989)).

## DISCUSSION

### I.    AFC, Ross, and Wilshire Are Subject to Personal Jurisdiction in New Jersey

When a defendant challenges an action for lack of personal jurisdiction, and the court does not hold an evidentiary hearing, the plaintiff "need only establish a prima facie case of

personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." <u>Miller Yacht Sales, Inc. v. Smith</u>, 384 F.3d 93, 97 (3d Cir. 2004) (citation omitted).

Plaintiffs have alleged that AFC, Ross, and Wilshire, directly and through agents, have had continuous and systematic involvement in New Jersey real estate, including the properties at issue in this case, since the early 1990's.  (Declaration of Ahron Kirzner ("Kirzner Decl."), at ¶¶ 3, 28; AC ¶ 24.)  This continuous and systematic involvement includes: (1) the agreements[8] Plaintiffs entered into with Ross and his entities in 1991 in relation to the management of the Colonnades Apartments in Newark, New Jersey (Kirzner Decl. ¶ 4); (2) a lawsuit brought against Plaintiffs by Ross and his entities in New Jersey Superior Court in 1994, over the operation of the Colonnades Apartments, which later was resolved by a visit by Ross to New Jersey to meet with Plaintiffs (Id. ¶ 5); (3) visits beginning in or about 1994 by Ross and his entities' agent Debra Ernst, and/or her assistant, to New Jersey several times a year to review the Colonnades Apartments' books and records (Id. ¶ 7); (4) negotiations by Ross and Rozet's agent Louis A. Cicalese with Plaintiffs in 1998 in New Jersey regarding a new set of agreements concerning the Colonnades Apartments[9] (Id. ¶ 8); (5) Ross' meeting with Kirzner and inspection of the

_____

[8]Pursuant to which Glass Tower became a co-general partner along with Wilshire (Ross' entity and AFC's subsidiary) of Colonnades Apartments Ltd., which owns the possessory and management rights to the Colonnades Apartments.  (Kirzner Decl. ¶ 4.)

[9]These negotiations led to a set of agreements between Plaintiffs and Ross and his entities, executed as of July 1, 1998 and signed by Ross on behalf of Wilshire.  (Kirzner Decl. ¶ 8.)  Pursuant to those agreements, Wilshire's status was changed from "co-general partner" to "co-managing general partner" with "full and equal authority to approve all major decisions with respect to the operation of the property and the partnership."  (Id.)  Lois Rozet, Rozet's wife, signed for Stonepine and Toucano, Inc., and Ross' wife, Joyce, attested as vice-president of those entities.  (Id.)

Colonnades property in New Jersey sometime after the 1998 agreements were executed (Id. ¶ 9); (6) several visits by Rozet from 1991 to 1998 to New Jersey with regard to the properties (Id. ¶ 10); (7) Ross' meeting with Kirzner in 1999 in New Jersey in connection with the F.D. Worth Properties[10] (Id. ¶ 11); (8) visits by Defendants' agents Stuart Bernstein[11] and later Mr. Tell[12] to watch over Plaintiffs' management of the Colonnades Apartments and the F.D. Worth Properties (Id. ¶ 13); (9) calls from Ross to Garden State's controller, Khublall, about issues relating to the properties (usually questions about payments to various of his entities) (Id. ¶ 18); (10) substantial revenue derived by Ross and/or his entities from the New Jersey properties and other New Jersey real estate over the years (most recently, the wire transfer of $6,000,000.00 in conjunction with the closing of the Colonnades loan); (11) numerous telephone discussions, exchanges of e-mails, and correspondence in 2003 between Ross, Rozet, and Kirzner, about Kirzner's purchase of either the wrap interests or the fee interests in the properties (Id. ¶ 20); (12) the Closing Statement faxed by Ross to New Jersey in which he expressly acknowledges the parties' agreement regarding the New Jersey properties (Id. ¶ 21); and (13) Ross' visit (accompanied by Mr. Tell) to New Jersey in December of 2004, where he met with Kirzner and toured four of the five New Jersey properties.  (Id. ¶ 25.)

In addition, Plaintiffs allege that Ross and Rozet (now, after Rozet's death, Ross alone)

---

[10]In the Fall of 1999, Plaintiffs began managing the F.D. Worth Properties, again reporting to Ross and Rozet.  (Kirzner Decl. ¶ 12.)  However, Plaintiffs' management agreements were with InterCoastal, which was not owned by Ross and Rozet.  (Id.)

[11]Stuart Bernstein lived in Baltimore, Maryland but stayed in New Jersey from Monday through Thursday.  (Kirzner Decl. ¶ 13.)  He reported directly to Ross and Rozet.  (Id.)

[12]Kirzner was present when Ross instructed Mr. Tell to begin regular visits to New Jersey.  (Kirzner Decl. ¶ 15.)  From sometime in 2000 on, Mr. Tell began visiting the New Jersey properties and Plaintiffs' management offices approximately once a month.  (Id. ¶ 16.)  He has made such visits continuously since that time.  (Id.)  Mr. Tell reports directly to Ross.  (Id.)

were in control of the underlying rights in the New Jersey properties, and that the various

Ross/Rozet entities, including, specifically AFC and Wilshire, exist as vehicles for Ross to

conduct and profit directly and indirectly, from the operation of various multi-family rental

properties throughout the country, including New Jersey.  (Id. ¶ 17.)  Plaintiffs further allege that

only Ross and Rozet (now only Ross) had authority to make significant decisions with regard to

the entities or the properties.  (Id.)  Specifically, Mr. Tell (or other of Ross' agents) would

respond about an issue, in words or substance: "I'll talk to Deane [Ross] and get back to you."

(Id.)

     Plaintiffs have made specific allegations of AFC's, Ross', and Wilshire's continuous and

systematic involvement in New Jersey since the early 1990's.  Not only have AFC, Ross, and

Wilshire entered into agreements with New Jersey individuals and entities involving New Jersey

real estate, they also allegedly own interests in New Jersey real estate either directly or indirectly,

have derived significant income from their interests in New Jersey real estate, have had their

agents visit New Jersey regularly for more than ten years, and have engaged in continuous

communications with Plaintiffs in New Jersey.

     Based on these allegations, it appears that the nature of AFC's, Ross', and Wilshire's

contacts with New Jersey respecting New Jersey real estate is central to the conduct of their

business.  See Provident Nat'l Bank, 819 F.2d at 438 (finding that defendant's activities relating

to Pennsylvania (i.e., the borrowing and lending of money), were the bread and butter of its daily

business and therefore central to its business).

     In Provident Nat'l Bank, the court observed that due to the nature of defendant's contacts

with Pennsylvania, it would have a greater expectation of being haled into court in Pennsylvania

than the Helicopteros defendant had of being haled into court in Texas.  See id. (discussing

Helicopteros and noting that defendant's activities in Texas (soliciting services there, negotiating a contract there, and purchasing helicopters and related items from a Texas company were important, but not central to defendant's business). The same can be said here. Due to the nature of their contacts, AFC, Ross, and Wilshire would have a greater expectation of being haled into court in New Jersey than a defendant whose contacts were not central to its business. See id. In light of Plaintiffs' allegations of AFC's, Ross', and Wilshire's continuous and systematic contacts with New Jersey, and the apparent centrality of those contacts to their business, this Court finds that Plaintiffs have established a prima facie case of personal jurisdiction as to Defendants AFC, Ross,[13] and Wilshire. Accordingly, Defendants' motion to dismiss on this

---

[13]Defendants argue that Ross is not subject to personal jurisdiction in New Jersey because he has had no contacts with New Jersey other than in his capacity as an officer or shareholder of business entities that have interests there. Generally, a person "is not individually subject to personal jurisdiction merely based on his actions in a corporate capacity." TJS Brokerage & Co. v. Mahoney, 940 F. Supp. 784, 788-89 (E.D. Pa. 1996). However, courts have held such defendants subject to personal jurisdiction where it is shown that "the defendant had a major role in the corporate structure, the quality of his contacts with the state were significant, and his participation in the tortious conduct alleged was extensive." Id. "If those factors are present, the defendant's contacts with the forum in his corporate capacity may be considered in deciding if he should be subject to jurisdiction in an individual capacity." Id. Here, Plaintiffs have alleged that Ross "owns or controls, directly, indirectly, or through 'nominees' the other Defendants" and that he "makes virtually all important decisions for and directs the activities of each Defendant." (AC ¶ 12.) In addition, Khublall, the controller for Garden State, has stated that:

> I have been with Garden State since February 1993. Throughout my tenure, it was clear to me at all times that regardless of the formal entity names used, the Properties [referring to the F.D. Worth Properties and the Colonnades Apartments] were controlled by Mr. Ross and his late business partner Bruce Rozet. In fact, most decisions regarding the Properties, other than routine day-to-day management decisions, were made by Mr. Ross.

(Declaration of Osh Khublall ("Khublall Decl."), at ¶ 4.) Furthermore, Plaintiffs have alleged that the quality of Ross' contacts with New Jersey were significant (see supra pp. 11-12), and that his participation in the tortious conduct alleged was extensive. In fact, Kirzner has stated that he "believe[s] that Mr. Ross caused Intercoastal [sic] (which he does not own) to terminate Garden State's management." (Kirzner Decl. ¶ 26.) Therefore, Ross' contacts with New Jersey in his

14

ground is denied.

## II.     Plaintiffs' Claims

### A.     Count One: Fraud

Defendants argue that Plaintiffs' fraud claim must be dismissed because it fails to plead the circumstances of the fraud with particularity, as required by FED. R. CIV. P. 9(b) ("Rule 9(b)").  Defendants further argue that Plaintiffs fail to satisfy Rule 9(b) because their claims for fraud are against all "defendants," and do not specify who made which representation to whom. This Court agrees.  Defendants' motion to dismiss as to Count One of the Amended Complaint will be granted.

The requirements of Rule 9(b) may be satisfied if the complaint describes the circumstances of the alleged fraud with precise allegations of date, time or place.  See Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989) (citing Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984)).  Alternatively, plaintiffs may use some other means of "injecting precision and some measure of substantiation into their allegations of fraud."  Seville, 742 F.2d at 791 (holding that the plaintiff satisfied Rule 9(b) "by incorporating into the complaint a list identifying with great specificity the pieces of machinery that were the subject of the alleged fraud").

Pleadings containing collectivized allegations against "defendants" do not suffice.  "Rule

_____

corporate capacity may be considered when evaluating whether he is subject to personal jurisdiction in this state.  Ross' contacts in his corporate capacity, combined with his contacts in his individual capacity (personal visits to New Jersey in 1994, 1998, and November 2004 relating to New Jersey real estate, extensive communications (phone, correspondence, e-mail, and fax) directed at Plaintiffs in New Jersey, and tortious acts causing damage in New Jersey, including fraud and tortious interference) are more than sufficient to find Ross subject to this Court's jurisdiction.

9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'" Eli Lilly & Co. v. Roussel Corp., 23 F. Supp. 2d 460, 491 (D.N.J. 1998) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).  A plaintiff must plead fraud with particularity with respect to each defendant, thereby informing each defendant of the nature of its alleged participation in the fraud.  See, e.g., Seville, 742 F.2d at 791; Strange v. Nationwide Mut. Ins. Co., 867 F. Supp. 1209, 1219-20 (E.D. Pa. 1994) (complaint alleging that defendants' agents made fraudulent representations but failing to identify what agent or employee of defendants communicated the misrepresentations, did not satisfy particularity requirements of Rule 9(b)).

Here, Plaintiffs' fraud claim contains collectivized allegations against "defendants." Plaintiffs allege that "[t]he representations made by Defendants to Plaintiffs regarding, *inter alia*, the continuing management of the Colonnades Apartments and the FD Worth Properties, an equity interest in the FD Worth Properties wraps, and delivery of the options, were false and fraudulent when made because the Defendants did not intend to fulfill their promises . . . ."  (AC ¶ 79.)  Plaintiffs have failed to plead fraud with the requisite particularity with respect to each defendant, and have thereby failed to inform each defendant of the nature of its alleged participation in the fraud.  See, e.g., Seville, 742 F.2d at 791.  Accordingly, Plaintiffs have failed to satisfy the requirements of Rule 9(b) and Count One must be dismissed.[14]  Therefore, Defendants' motion to dismiss as to Count One of the Amended Complaint will be granted.

---

[14]With the admonition that an amended pleading that fails to distinguish among defendants and lacks detail will not withstand a motion to dismiss, Plaintiffs may amend their complaint to satisfy the federal pleading requirement.  See Saporito v. Combustion Engineering Inc., 843 F.2d 666, 675 (3d Cir. 1988), vacated on other grounds, 489 U.S. 1049 (1989); see also FED. R. CIV. P. 15(a) (leave to amend "shall be freely given when justice so requires").

### B.      Count Two: Breach of Contract

Defendants focus their attack on the sufficiency of Count Two by arguing that Plaintiffs have alleged no binding contracts because Plaintiffs' alleged agreements would be unenforceable under both California and New Jersey's statute of frauds.[15]  This Court disagrees.  Defendants' motion to dismiss as to Count Two of the Amended Complaint will be denied.

"An affirmative defense grounded in the statute of frauds properly may be raised in the context of a motion to dismiss."  Coastal Group, Inc. v. Westholme Partners, 1996 WL 33545605, at *4 (D.N.J. 1996) (citing ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994)).  However, that motion only may be granted "if it is clear from the face of the complaint or the documents attached thereto that the statute of frauds presents an insurmountable bar to plaintiff's cause of action."  Id.  In the instant matter, that conclusion is far from certain.

First, assuming that the statute of frauds applies, Plaintiffs have alleged the existence of

---

[15]Defendants argue that California's statute of frauds applies here because the November 2003 Agreement was allegedly agreed to in California.  (Defs.' Reply Mem. 8.)  Defendants further argue that California's statute of frauds renders Plaintiffs' alleged oral agreement unenforceable because under California's statute of frauds, contracts involving the sale of real property or an interest therein, must be in writing.  (Defs.' Mem. 32.)  Plaintiffs argue that New Jersey law should govern here, because New Jersey has had the most significant contacts with the contract and its subject matter.  (Pls.' Br. 15-16.)  Indeed, Plaintiffs have alleged that the October 1999 Agreement was negotiated, agreed to, and performed in New Jersey.  (AC ¶¶ 45, 47-48.)  It is undisputed that the subject matter of the October 1999 Agreement was in New Jersey and that Plaintiffs all maintain their principal offices in New Jersey.  (Id. ¶¶ 3, 27-31.)  Regarding the November 2003 Agreement, Plaintiffs have alleged that the subject matter of the agreement is in New Jersey, the contract is to be performed in New Jersey, and Plaintiffs are located in New Jersey.  (Id. ¶¶ 3, 27-31, 63.)  Plaintiffs have acknowledged that while some of the negotiations took place in California, they assert that the place of contracting was New Jersey because the signed Closing Statement specifically referencing the November 2003 Agreement was received and accepted in New Jersey.  (Pls.' Br. 15-16.)  The law governing a contract claim in New Jersey is that of the jurisdiction "with the most significant relationship and closest contacts with the transaction and the parties."  National Utility Service, Inc. v. Chesapeake Corp., 45 F. Supp. 2d 438, 446 (D.N.J. 1999).  For the purposes of this motion, Plaintiffs' allegations meet this test.  Therefore, Plaintiffs' claims will be governed by New Jersey law.

specific documents (the handwritten notes from the November 2003 meetings and the signed Closing Statement) referencing the November 2003 Agreement.  Second, based solely on the allegations contained in Plaintiffs' Amended Complaint, it cannot be said with certainty that the alleged contracts were within New Jersey's statute of frauds and, thus, required to be in writing.

Defendants argue that a contract to transfer an interest in real estate (which they argue is at issue here) must comply with New Jersey's statute of frauds, pursuant to N.J. STAT. ANN. 25:1-13.  The statute of frauds permits an agreement to be established by a writing, or by "clear and convincing evidence."  N.J. STAT. ANN. 25:1-13(a) and (b).  Defendants argue that Plaintiffs cannot meet the statute's standards.  Plaintiffs argue that their agreements, primarily related to the right to options to acquire existing installment land contract and mortgage rights, are not direct options or liens on real estate, and therefore are not subject to the statute of frauds.  Even assuming that the statute of frauds could apply to the case at bar, Plaintiffs have alleged the existence of written documents, and have made considerable allegations which could permit them to establish the Agreements by "clear and convincing evidence."  N.J. STAT. ANN. 25:1-13(b).

On a motion to dismiss, this Court's inquiry is limited to examining the sufficiency of the Amended Complaint.  The Amended Complaint contains allegations regarding the existence of both the 1999 and 2003 Agreements.  Therefore, this Court cannot say at this juncture that Plaintiffs will be unable to prove a set of facts demonstrating the existence of the alleged Agreements.  This Court finds that Count Two of Plaintiffs' Amended Complaint is sufficient to state a claim for breach of contract.  Accordingly, Defendants' motion to dismiss as to Count Two of the Amended Complaint will be denied.

18

### C.      Count Three: Breach of the Duty of Good Faith and Fair Dealing

"[E]very contract imposes on each party the duty of good faith and fair dealing in its

performance and its enforcement." Pickett v. Lloyd's & Peerless Ins. Agency, Inc., 131 N.J. 457,

467 (1993).  The implied covenant therefore ensures that "neither party to a contract shall injure

the right of the other to receive the fruits of the agreement." Onderdonk v. The Presbyterian

Homes of New Jersey, 85 N.J. 171, 182 (1981).  In the instant matter, Defendants' only argument

posited to support their motion to dismiss Count Three of the Amended Complaint is that

Plaintiffs' Amended Complaint fails to plead a binding agreement (i.e., no contract exists) and

therefore, there was no duty of good faith and fair dealing.  (Defs.' Mem. 42; Defs.' Reply Mem.

16.)  As this Court concluded in part II. B. above, however, Defendants have not demonstrated

that there is no set of facts on which Plaintiffs could prove the existence of the alleged

Agreements.  Accordingly, because this Court will deny Defendants' motion to dismiss Count

Two of the Amended Complaint, it correspondingly must deny Defendants' motion with respect

to Count Three as well.

### D.      Count Four: Promissory Estoppel

In order to state a claim under the doctrine of promissory estoppel, a plaintiff must allege:

"(1) a clear and definite promise, (2) made with the expectation that the promisee will rely

thereon, (3) and which the promisee reasonably does, (4) resulting in a definite and substantial

detriment incurred in that reliance." Fairken Assoc. v. Hutchin, 223 N.J. Super. 274, 279-80

(Law Div. 1987).  In support of their motion to dismiss, Defendants argue that Plaintiffs have

failed to allege facts regarding their reliance on the alleged promises, and that they failed to

allege that their reliance was detrimental.  In fact, Plaintiffs allege in paragraphs 64 through 66,

and 81 of the Amended Complaint that they proceeded with the Colonnades closing (including

19

putting into escrow portions of the funds) in reliance on the parties' agreement.  Those

allegations are incorporated into Count Four by paragraph 90.  Plaintiffs' reliance is reiterated in

paragraph 91, where they also allege that their reliance was to their detriment.

On a motion to dismiss, this Court may examine only the sufficiency of the allegations

contained in Plaintiffs' Amended Complaint.  Therefore, this Court concludes that Plaintiffs have

alleged sufficiently that they relied on the alleged promises and that their reliance was

detrimental.  Accordingly, Defendants' motion to dismiss Count Four of the Amended Complaint

will be denied.

### E.      Count Five: Implied Contract (Unjust Enrichment)

A claim under the quasi-contractual theory of unjust enrichment has only two essential

elements: "(1) that the defendant has received a benefit from the plaintiff, and (2) that the

retention of the benefit by the defendant is inequitable."  Wanaque Borough Sewerage Auth. v.

West Milford, 144 N.J. 564, 575 (1996) (internal citations omitted).  "The unjust enrichment

doctrine requires that plaintiff show that it expected remuneration from the defendant at the time

it performed or conferred a benefit on defendant and that the failure of remuneration enriched

defendant beyond it contractual rights."  VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554

(1994) (citation omitted).

Defendants argue that the Amended Complaint makes only conclusory allegations of

unjust enrichment and quantum meruit.  (Defs.' Reply Mem. 17.)  In essence, Defendants

contend that Plaintiffs have failed to allege a benefit retained by Defendants for which Plaintiffs

were not compensated.  (Id.)

Plaintiffs have alleged that they proceeded with the Colonnades closing in reliance on the

parties' agreement, and that Defendants received $6,000,000.00 in closing proceeds.  (AC ¶¶ 66-

68.)  However, they have not alleged any facts in the Amended Complaint indicating that they

expected remuneration from Defendants at the time they proceeded with the closing or that the

failure of remuneration enriched Defendants beyond their contractual rights.  Accordingly,

Defendants' motion to dismiss Count Five of the Amended Complaint will be granted.[16]

### F.      Count Six: Tortious Interference

"To state a claim for tortious interference with business relationships, a plaintiff must

allege that: (1) it had a continuing or prospective economic relationship or reasonable expectation

of economic advantage; (2) the defendant knew of such relationship of expectancy; (3) the

interference and harm inflicted were done intentionally and with 'malice' in the sense of conduct

that is wrongful and without justification or excuse; (4) if not for the interference, it was

reasonably probable that plaintiff would have realized its economic advantage; and (5) the

plaintiff was injured as a result of defendant's conduct."  Eli Lilly & Co., 23 F. Supp. 2d at 493-

494 (citation omitted).

Defendants argue that Plaintiffs' claim for tortious interference is defective because their

claims are not against a third party.  It is true that a tortious interference claim must "be directed

against defendants who are not parties to the relationship."  Printing Mart-Morristown v. Sharp

Elec. Corp., 116 N.J. 739, 752 (1989).  However, contrary to Defendants' assertions, Plaintiffs

have alleged that Defendants, in particular Ross, tortiously interfered with Plaintiffs' agreements

with InterCoastal, agreements to which Defendants were not a party.  Viewing Plaintiffs'

allegations in the light most favorable to Plaintiffs, and drawing all reasonable inferences

therefrom, the allegations acknowledge that Ross facilitated Plaintiffs' relationship with

---

[16]Pursuant to FED. R. CIV. P. 15(a), Plaintiffs will be granted leave to amend Count Five.

InterCoastal, but also indicate that he was not a party to the agreements between Plaintiffs and InterCoastal.  It is with respect to those agreements that Plaintiffs allege Defendants have tortiously interfered.[17]

While Count Six of the Amended Complaint is not a model of precision, it is sufficient to state a claim for tortious interference.  Accordingly, Defendants' motion to dismiss Count Six of the Amended Complaint will be denied.

## III.   Defendants' Motion to Strike

Rule 12(f) of the Federal Rules of Civil Procedure ("Rule 12(f)") states, in pertinent part, that "the court may order stricken from any pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  FED. R. CIV. P. 12(f).  "A court possesses considerable discretion in disposing of a motion to strike under Rule 12(f)."  River Road Dev. Corp. v. Carlson Corp., 1990 WL 69085 at *2 (E.D. Pa. 1990).  However, motions to strike are not favored and usually will be denied "unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case."  Id.  "Partly because of the practical difficulty of deciding cases without a factual record it is well established that striking a pleading should be sparingly used by courts.  It is a drastic remedy to be resorted to only when required for the purposes of justice."  United States v. Consolidation Coal Co., 1991 WL 333694 at *1 (W.D. Pa. 1991).

Defendants argue that paragraphs 16, 17, 18, and 68 of the Amended Complaint contain

---

[17]In as much as Plaintiffs' allegations could be interpreted as claiming that Defendants tortiously interfered with Plaintiffs' contractual rights and prospective economic advantages in their business based on the October 1999 and November 2003 Agreements, Agreements to which Defendants are a party, such allegations would fail to state a claim for tortious interference.  See Printing Mart-Morristown, 116 N.J. at 752.

immaterial and prejudicial allegations, and should be stricken under Rule 12(f).  Plaintiffs argue

that paragraphs 16, 17, and 18 relate to the background of the parties' relationship, and that

paragraph 68 relates to the Colonnades loan closing.

Here, it appears that these specific allegations may relate to the controversy and are not

particularly prejudicial.  Therefore, they do not warrant the "drastic remedy" of striking them

from the Amended Complaint.  Id.  Accordingly, Defendants' motion to strike is denied.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is granted in part and

denied in part.  Defendants' motion to dismiss as to Defendants AFC, Ross, and Wilshire, for

lack of personal jurisdiction, pursuant to FED. R. CIV. P. 12(b)(2), is denied.  Defendants' motion

to dismiss the Amended Complaint, pursuant to FED. R. CIV. P. 12(b)(6), is granted as to Counts

One and Five,[18] and denied as to Counts Two, Three, Four, and Six of the Amended Complaint.

Defendants' motion to strike specific allegations of the Amended Complaint, pursuant to FED. R.

CIV. P. 12(f), is denied.


Dated: March 30, 2006


                                         S/Joseph A. Greenaway, Jr.
                                         JOSEPH A. GREENAWAY, JR., U.S.D.J.


---

[18]Plaintiffs have been granted leave to amend Counts One and Five.